# 22-2731

## In the
## United States Court of Appeals
## For the Second Circuit

WINSTON HENVILL,

*Plaintiff-Appellant,*

– v. –

METROPOLITAN TRANSPORTATION AUTHORITY, JOHN D'AGOSTINO,
KATHLEEN FINNERAN, JOSEPH PUGLIESE, STEVE GUARDINO,
RICKY SMITH, KEVIN KIERAN, ALEXANDER LINDSAY,
CHRISTOPHER NUTTER and MICHAEL YASSO,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (NEW YORK CITY)

## BRIEF FOR DEFENDANT-APPELLEE
## METROPOLITAN TRANSPORTATION AUTHORITY

GOLDBERG SEGALLA LLP
*Attorneys for Defendant-Appellee*
*Metropolitan Transportation Authority*
11 Martine Avenue, Suite 750
White Plains, New York 10606
(914) 798-5465
woconnell@goldbergsegalla.com

# CORPORATE DISCLOSURE STATEMENT

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

WINSTON HENVILL,                                    Case No.: 22-2731

                    Plaintiff,

          vs.                                       **RULE 26.1 STATEMENT**

METROPOLITAN TRANSPORTATION
AUTHORITY, JOHN D'AGOSTINO,
KATHLEEN FINNERAN, JOSEPH PUGLIESE,
STEVE GUARDINO, RICKY SMITH, KEVIN
KIERAN, ALEXANDER LINDSAY,
CHRISTOPHER NUTTER, MICHAEL YASSO,


                    Defendants.
_____

          Defendant the Metropolitan Transportation Authority ("MTA") is a public

benefit corporation under New York State Public Authorities Law Section 1260, et

seq.  Accordingly, Rule 26.1 does not apply to the MTA.

Date:  May 3, 2023
          White Plains, New York

                              **GOLDBERG SEGALLA, LLP**

                              /s/ William T. O'Connell
                              William T. O'Connell, Esq.
                              50 Main Street, Suite 425
                              White Plains, New York 10606
                              Telephone: (914) 798-5465/
                              Fax: (914) 798-5401
                              *Attorneys for Defendant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………*iii*

STATEMENT OF THE ISSUES...………………………………….……….1

STATEMENT OF THE CASE…………………………………………….........2

    A.    Introduction…………………………………………….….2

    B.    Plaintiff's Pre-Termination Disciplinary History ………………….……3

    C.    Command Discipline For Plaintiff's Acceptance Of Two Tours Of Overtime On The Same Day In Different Commands……..……….6

    D.    Alleged Disparate Treatment For Overtime Infractions………………..8

    E.    Removal Of Plaintiff's Summons-Writing Responsibilities…………..11

    F.    Plaintiff's Termination…………………..…………………………..13

    G.    Disparate Treatment Allegations Relating To Termination……………18

    H.    Procedural History…………………………………………..21

    I.    District Court Order And Judgment Appealed From…………………..26

SUMMARY OF ARGUMENT…………………………………………...31

ARGUMENT……………………………………………………….. 33

    I.    PLAINTIFF'S RACE DISCRIMINATION CLAIMS WERE PROPERLY DISMISSED BECAUSE PLAINTIFF FAILED TO MAKE A PRIMA FACIE SHOWING OF RACE DISCRIMINATION BY DISPARATE TREATMENT EVIDENCE OR OTHERWISE, AND EVEN IF HE DID, HE MADE NO FURTHER EVIDENTIARY SHOWING THAT MTA'S LEGITIMATE, NON-DISCRIMINATORY REASONS REASONS FOR PLAINTIFF'S DISCIPLINE AND TERMINATION WERE FALSE AND PRETEXTUAL……………...33

        A.    Standard of Review…………………………………………...33

        B.    Plaintiff's Appellate Arguments On Race Discrimination Claims……………………………………………........34

C.      Applicable Law On Race Discrimination Claims……………..…35

D.      Plaintiff's Disparate Treatment Evidence Failed To Raise
        An Inference Of Intentional Discrimination By MTA…………37

        (1)     Disparate Treatment Evidence For Overtime
                Violations………………………………………………...38

        (2)     Disparate Treatment Regarding Plaintiff's Discipline
                And Termination After The IAB Investigation…………..41

E.      Even If Plaintiff Made A Prima Facie Showing Of
        Discrimination, MTA Met Its Burden Of Showing A
        Legitimate, Non-Discriminatory Reason For Plaintiff's
        Discipline And Termination…………………………………....44

F.      Plaintiff Failed To Make Any Showing Of Pretext……………46

G.      Plaintiff's NYCHRL Claims Were Properly Dismissed………..48

II.     PLAINTIFF'S RETALIATION CLAIMS WERE PROPERLY
        DISMISSED BECAUSE HE FAILED TO DEMONSTRATE A
        CAUSAL CONNECTION BETWEEN HIS PROTECTED
        ACTIVITY AND MTA'S DISCIPLINE OR TERMINATION,
        OR THAT MTA'S REASONS FOR SUCH DISCIPLINE
        AND TERMINATION WERE PRETEXTUAL………………..…...49

        A.      Plaintiff's Retaliation Arguments On Appeal…………………...49

        B.      Plaintiff Failed To Make A Prima Facie Showing That
                Plaintiff's Discipline And Termination Were Retaliation
                For His Protected Activity, Nor a Pretext For Discrim-
                ination……………………………………………….......50

        C.      The Retaliation Claim Under NYCHRL Was Properly
                Dismissed ………………………………………………57

CONCLUSION……………………………………………………...…..59

CERTIFICATE OF COMPLIANCE…………………………………...60

# TABLE OF AUTHORITIES

**Cases**                                                        **page**

Adams v. City of New York,
756 Fed. Appx. 85 (2d Cir. 2019)……………………………………………………..……49

Alvarado v. Nordstrom, Inc.,
685 Fed. Appx. 4, 2017 U.S. App. LEXIS 5426 ……..……………………….…….....57

Bentley-Ammonds v. Northwell Health, Inc.,
2022 U.S. App. LEXIS 7999…………...…………………………………...39, 42, 53

Crawford v. Franklin Credit Mgmt. Corp.,
758 F.3d 473, 486 (2d Civ. 2014)…………………………………………………34

Dawson [v. Bumble,
398 F.3d 211, 216-17 (2d Cir. 2005)………………………………………..…..50

Ehrbar v. Forest Hills Hosp.,
131 F.Supp.3d 5 (EDNY 2015)…………………………………………………...55

El Sayed v. Hilton Hotels Corp.,
627 F.3d 931 (2d Cir. 2010)……………………………………………………53

Gorzynski v. JetBlue Airways Corp.,
596 F.3d 93 (2d Cir. 010)………………….…………………………………33, 53

Graham v. Long Island R.R.,
230 F.3d 34 (2d Cir. 2000)……………………………………..……35, 36, 46

Harge v. City of New York,
2022 U.S. App. LEXIS 33637 (2d Cir.)...……………………………….…47, 48

Hicks v. Baines,
593 F.3d 159 (2d Cir. 2010)……………………………………………..…35, 50

Jiminez v. Delta Airlines, Inc.,
2023 U.S. App. LEXIS 8726 (2d Cir.)...……………………………………………47

**Cases**                                                                    **page**

Jute v. Hamilton Sundstrand Corp.,
420 F.3d 166 (2d Cir. 2005)……………………………………………………51

Kwan v. Andalex Grp., LLC,
737 F.3d 834 (2d Cir. 2013)……………………………………………….*passim*

Littlejohn v. City of New York,
795 F.3d 297 (2d Cir. 2015) ………………………………………………...35

Mandell v. County of Suffolk,
316 F.3d 368 (2d Cir. 2003)……………………………………………………36

McDonnell Douglas Corp. v. Green,
411 U.S. 792, 802, 93 S. Ct. 1817 (1973)……………………...…..…………*passim*

McKinney v. Bennett,
2009 U.S. Dist. LEXIS 84713 (SDNY 2009)……………….……………………40

Meiri v. Dacon,
759 F.2d 989 (2d Cir. 1985)……………………………………………...……39

Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.,
715 F.3d 102 (2d Cir. 2013)……………………………………………...…48, 57

Norton v. Sam's Club,
145 F.3d 114 (2d Cir. 1998), *cert. denied* 525 U.S. 1001
(1998)……………………………………………………………………….48, 58

Offor v. Mercy Med. Ctr.,
2023 U.S. App. LEXIS 6687 (2d Cir.)………………………………...…54, 56

Radwan v. Manuel,
55 F.4th 101 (2d Cir. 2022)……….……………………...….………………37

Raniola v. Bratton, 243 F.3d 610 (2d Cir.
2001)……...………………………………………………………………46

**Cases**                                                                    **page**

Ray v. A.Y. State Ins. Fund,
2018 U.S. Dist. LEXIS 120728 (SDNY)……………………………………...53, 56

Reed v. A.W. Lawrence & Co.,
95 F.3d 1170, 1177 (2d Cir. 1996)...……………………………………………50

Ruiz v. County of Rockland,
609 F.3d 486 (2d Cir. 2010)……………………..…………….....…………*passim*

Saji v. Nassau Univ. Med. Ctr.,
724 F. App'x 11 (2d Circ. 2018)……………………………………............40

Shumway v. United Parcel Serv., Inc.,
118 F.3d 60 (2d Cir. 1997)……………………..………………………...37, 39

Slattery v. Swiss Reinsurance Am. Corp.,
248 F.3d 87 (2d Cir. 2001)...…………………………………..………54, 56

Spiegel v. Schulmann,
604 F.3d 72 (2d Cir. 2010)……..…………………………………………35

St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502, 125 S.Ct. 407 (1993)……………………………………………35

Summa v. Hofstra Univ.,
708 F.3d 115 (2d Cir 2013])……………………………………………33

Toussaint v. N.Y. Dialysis Servs.,
230 F.Supp.3d 198 (SDNY 2017)……………………………….......40

United States v. Brennan,
650 F.3d 65 (2d Cir. 2011)…………………………………………..51

University of Texas Sw. Med. Ctr. v. Nassar
(570 U.S. 338; 133 S.Ct. 2517 [2013])……………………………………52

**Cases**                                                                      **page**

Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global, LLC,
2022 U.S. App. LEXIS 18651……….…………………………………...…33, 39

Vega v. Hempstead Union Free Sch. Dist.,
801 F.3d 72 (2d Cir. 2015)……...………………………………………..35, 44

Weber v. City of New York,
973 F.Supp.2d 227 (EDNY 2013)…………………………………………...55

Weinstock v. Columbia Univ.,
224 F.3d 33 (2d Cir. 2000)…………………………..………………………51

Ya-Chen Chen v. City Univ. of N.Y.,
805 F.3d 59 (2d Cir. 2015)…...………………………………………...…48, 58

Zheng-Smith v. Nassau Health Care Corp.,
2021 U.S. App. LEXIS 27084 (2d Cir.)……………………………………35, 36

## Statutes and Other Authorities

42 U.S.C. § 2000 et seq…...………………………………………...…2, 35

N.Y. Executive Law § 290 et seq ………………………………………………2

N.Y.C. Administrative Code § 8-107……………………………………...…2

## STATEMENT OF THE ISSUES

1.      Whether Appellee MTA's motion for summary judgment demonstrated that Plaintiff-Appellant failed to establish a prima facie case for race discrimination under Title VII, the NYSHRL and the NYCHRL, regarding (1) MTA's Command Discipline of plaintiff for accepting two tours of overtime on the same day, and (2) MTA's disciplining and terminating him for being untruthful during an Internal Affairs investigation, where Plaintiff failed to submit competent evidence of disparate treatment sufficient to raise an inference of discrimination based on Henvill's race?

2.      Whether, assuming Henvill established a prima facie case of race discrimination, his disparate treatment evidence was sufficient to permit a rational trier of fact to find that MTA's proffered "legitimate, non-discriminatory reasons" for disciplining and terminating him were false and pretextual?

3.      Whether MTA demonstrated its entitlement to summary judgment dismissal of Henvill's retaliation claims, alleging the retaliatory removal of his summons-writing authority and his retaliatory termination based on a finding that Plaintiff was untruthful during an IAB investigation, where Plaintiff's evidence of temporal proximity and alleged disparate treatment were insufficient to create a jury question as to a causal connection between plaintiff's protected activity and the adverse employment actions?

1

## STATEMENT OF THE CASE

### A.    Introduction

Defendant-Appellee, The Metropolitan Transportation Authority ("MTA"), is a New York State public benefit corporation that has its own Police Department ("MTAPD").    (J.A.535).[1]    Plaintiff-Appellant, Winston Henvill ("Plaintiff" or Henvill"), is a Black former police officer with the MTAPD.  (J.A.535).  Henvill was terminated by MTA on April 29, 2015 after a neutral arbitrator found "just cause" for his termination based on his untruthfulness during an Internal Affairs Bureau ("IAB") investigation and his progressive disciplinary history.  (J.A.549-551).

Henvill brought this action against MTA for race-based discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 (42 U.S.C. §2000e *et seq.*  ["Title VII"]), the New York State Human Rights Law (N.Y. Executive Law § 290 *et seq.* ["NYSHRL"]), and the New York City Human Rights Law (N.Y.C. Administrative Code § 8-107 ["NYCHRL"]).  (J.A. 65-81).

Specifically, Plaintiff's Second Amended Complaint ("SAC") alleges that MTA discriminated against him by disciplining him in 2011 for his acceptance of two tours of overtime in different commands on the same date, and by terminating him in 2015 after an arbitrator found he was untruthful during an Investigation.  (J.A.24-39; 540).

---

[1] Unless otherwise indicated, references in parentheses are to the corresponding page numbers in the Joint Appendix (J.A.\_\_) or Special Appendix (S.A.\_\_).

Plaintiff also alleges that MTA retaliated against him after he filed two charges alleging discrimination and retaliation with the U.S. Equal Employment Opportunity Commission ("EEOC") in January and May 2012 by: (1) removing his summons-issuing authority in March 2012, and (2) by terminating him in 2015, after the IAB investigation and unfavorable arbitration finding. (J.A.24-39; 540). Plaintiff's theory of liability is premised on the alleged disparate treatment of Black and non-Black officers in the discipline imposed by MTA for work-related infractions. (J.A.24-39; 558, 562). According to Henvill, he was punished more severely and terminated by MTA for the same or similar conduct as committed by non-Black officers, raising an inference of racial discrimination and retaliation. (J.A.24-39; 540; 558, 562).

**B.    Plaintiff's Pre-Termination Disciplinary History**

As the district court aptly noted in its order, "Plaintiff's fourteen-year employment with the MTAPD was rife with disciplinary problems." (J.A.783). Prior to his termination, Plaintiff received at least twelve (12) Letters of Instruction, Command Disciplines, Notices of Intent to Discipline or other informal reprimands related to his conduct while working as a police officer for the MTA:

- On May 2, 2001, Plaintiff received a Letter of Instruction for arresting a driver for a suspended driver's license, removing a sum of money from the driver and giving it to another occupant of the vehicle, without counting the money or documenting the currency breakdown in his police memobook, and without

3

obtaining the signature of the recipient of the money or providing a receipt for

the same (J.A.291-294; 485);

- On December 20, 2002, Plaintiff received a Letter of Instruction for missing

traffic court appearances  (J.A.295-296; 487);

- On April 18, 2005, Plaintiff received a Letter of Instruction for leaving his

assigned post without notice and engaging in a foot pursuit of a suspect wanted

in a shoplifting incident (J.A.297-298; 501);

- On December 5, 2005, Plaintiff received a Letter of Instruction for illegible

memobook entries, failure to include the color of the day, weather conditions

and all RMP details, and the failure to include details about several traffic

stops that were initiated on his October 26, 2005 tour (J.A.299-300; 503-504);

- In October 2009, Plaintiff received a Notice of Intent to Discipline for his

failure to document and record Vehicle and Traffic Law summonses (J.A.166;

438-442);

- On March 25, 2010, Plaintiff received a Notice of Intent to Discipline for his

issuance of summonses without properly documenting them in his memobook

and, while making traffic stops, failing to properly notify the Communications

Unit (J.A.166-167; 444-447);

- On November 8, 2011, Plaintiff received a Command Discipline that resulted in a Letter of Instruction being issued to him for losing his memo book (J.A. 167; 489);

- On November 9, 2011, Plaintiff received a Command Discipline for accepting two tours of overtime on the same day in different commands (J.A.434; 491);

- On January 9, 2012, Plaintiff was issued a Notice of Intent to Discipline for an incident that occurred on December 10, 2011, where he abandoned his assigned training partner (J.A.168; 493-495);

- On January 26, 2012, Plaintiff received a Command Discipline for accepting an overtime assignment on a day for which he had previously agreed not to accept an overtime assignment (J.A.312-315; 497);

- On May 1, 2012, Plaintiff received a Command Discipline related to his February 28, 2012 issuance of three summonses to a wheelchair bound individual (J.A.168); and

- On October 15, 2012, Plaintiff received a Letter of Instruction for failure to make proper memobook entries and failure to be in possession of his uniform hat (J.A.499).

Plaintiff did not factually dispute any of these prior discipline-related measures before the district court. He only argued that the MTA did not consider Letters of

Instruction as "disciplinary action," and in his view, many of these actions were discriminatory and retaliatory. (J.A.552-555).

Although the twelve (12) incidents listed above summarize Henvill's progressive disciplinary history with MTAPD, there are three (3) specific disciplinary incidents that give rise to his discrimination and retaliation claims in this lawsuit: a) his November 2011 Command Discipline for accepting two overtime tours for the same day, in different commands, b) the March 12, 2012 removal of his summons-writing authority, and c) the June 17, 2013 Notice of Intent to Discipline for dishonesty during an IAB Investigation into another officer's missing memobook and subsequent termination in April 2015. The facts of these three incidents, the corresponding discipline imposed, as well as Plaintiff's purported evidence of disparate treatment, are considered below.

C. **Command Discipline For Plaintiff's Acceptance Of Two Tours Of Overtime on the Same Day in Different Commands**

Initially, on or about September 7, 2011, Plaintiff received a Command Discipline for accepting two tours of overtime for the same date in different districts. (J.A.316-318; 432). The September 7, 2011 Command Discipline stated that "[Plaintiff] did accept two (2) overtime positions (tours) for the same date," in two different districts, which "adversely affected the discipline and working efficiency of the department in this case, and cannot be viewed lightly." (J.A. 432). Plaintiff testified at his deposition that when he was told he was being disciplined for this

overtime violation by Lieutenant Ditttrich, Dittrich allegedly commented that he "had a target on his back." (J.A.608). Plaintiff conceded that Dittrich made no mention of race as a reason for being targeted. (J.A.608). The Disciplinary Action imposed was "thirty six (36) hours pay," and he was ineligible for overtime polling for a period of thirty (30) days. (J.A.432). Plaintiff declined to accept any disciplinary action without a contractual hearing. (J.A.318-319).

However, on or about November 9, 2011, Plaintiff received a Revised Command Discipline related to this same conduct of accepting two tours of overtime in different commands on the same day, which added that he did so "willing[ly]." (J.A. 321-322; 434). The November 9, 2011 Command Discipline also stated: "His actions caused District 9 to run one officer below normal staffing and also deprived another officer below him in seniority the ability to work a tour of overtime. His actions led to the reduction of efficiency of the department." (J.A.434).

The Disciplinary Action set forth in the November 9, 2011 Revised Command Discipline included: (1) suspending him from duty for eighteen (18) hours, with another eighteen hours held in abeyance for a period of one (1) year which could be forfeited in the event of a similar transgression during the proceeding twelve (12) months, and (2) forfeiture of all overtime polling for his next set of Relief Days following the suspension period. (J.A.434).

Significantly, Plaintiff signed the November 9, 2011 Revised Command Discipline, and checked a box on the form signifying that he agreed to "[a]ccept the

finding and the proposed disciplinary action" set forth.  (J.A.321-324; 434).  Despite

Plaintiff's agreement to accept the finding and discipline, he now alleges that he

accepted the two terms of overtime "unintentionally," because he did not remember

accepting the first overtime tour.  (J.A.557).  Lt. Pontorno testified at his deposition

that an MTA Police Officer "should" be disciplined if he or she intentionally accepts

two overtime tours on the same day.  (J.A.558; 678).

### D.  Alleged Disparate Treatment For Overtime Infractions

Plaintiff alleged in the district court that several officers, mostly Caucasian,

who he believes engaged in conduct similar to accepting two tours of overtime in

different commands on the same day -- such as missing or being late for an overtime

assignment -- were not disciplined for those similar acts. (J.A. 70-71; 558; 592-596;

597-581; 602-607).  MTA disputed that the conduct of affirmatively accepting two

tours of overtime on the same day in different commands was the same or similar

conduct as not showing up, or showing up late, for an overtime assignment.

(J.A.522).  MTA argued that while both species of misconduct result in understaffing

and the loss of overtime opportunities for another officer, the acceptance of two

conflicting overtime assignments affected staffing in two separate districts, not just

one.  (J.A.522).[2]

---

[2] As a matter of common sense, the intentional acceptance of two conflicting tours of
overtime also raises the issue of officer dishonesty, an issue that arises again with
respective to Plaintiff's ultimate termination.

Plaintiff's argument that he suffered disparate treatment in comparison to Caucasian MTA Police Officers who committed similar overtime infractions, but were not disciplined, was based on assumptions and hearsay, and overlooked the significant issue of prior Henvill's disciplinary history.  Henvill testified that in 2010 Police Officer Torone, a Caucasian Officer, took an overtime shift but did not show up for it.  (J.A.329-330).  Plaintiff said he "knew" about this infraction because he was working in the same district, and there was a "sheet" printed with those scheduled to work.  (J.A.330-332).  Plaintiff testified that accepting two overtime shifts on the same day, and not showing up for a single overtime shift, was "the same thing" because the result is that you have one post left "unmanned," and another officer is deprived of that overtime shift.  (J.A. 593).  Plaintiff admitted he had no knowledge of Officer Torone's prior disciplinary history at the time Torone failed to appear for his overtime shift. (J.A.331).

Henvill testified that in 2009 Officer Doscher, a Caucasian committed a similar overtime violation by not appearing for an overtime shift, or by appearing and leaving early.  (J.A.334-335).  He allegedly knew about this because he was working in District 3 in 2009, and Doscher's name allegedly was on the "list."  (J.A.598-599).  Henvill claimed to be aware of Doscher's disciplinary history, which allegedly included two instances of Doscher being pulled over for speeding in an unmarked MTA vehicle while driving his son to an upstate New York college.  (J.A.337-338).  Plaintiff testified he learned about these two incidents from talking with "other

9

officers," because "everyone was talking about it." (J.A.602). According to proof supplied by MTA during discovery, Doscher, in fact, was disciplined for two infractions arising from these incidents. (J.A.721).

Plaintiff testified that in 2009 Officer Scheck, a Caucasian officer, signed up for an overtime shift and did not appear for it. (J.A.340-341). He learned of this violation because he was working in the same District (J.A.341), but he was not aware if Officer Scheck had any prior disciplinary history. (J.A.341). Henvill offered the same type of allegation regarding Officer Pfeiffer, also Caucasian, stating that he came in for an overtime shift, but left early, and likewise admitted he did not know if Officer Pfeiffer had any disciplinary history. (J.A.341-342; 604-605).

Plaintiff testified that the four officers he named above (Torone, Doscher, Scheck and Pfeiffer), as well as three additional officers -- Lieutenant Zaino, Sergeant Ho and Officer Reimer -- all committed similar overtime violations as he had, but were not disciplined. (J.A.345). Henvill testified that he "knew" these officers were not disciplined for the overtime violations because "other officers would talk about it," and "by word going around" the various Districts. (J.A.345-349). Plaintiff admitted that he did not know about these alleged failures to discipline "firsthand," and instead, he was relying on "what other officers told me," which "you could say was hearsay." (J.A.345).

Plaintiff also admitted that he did not know the actual reasons these Caucasian officers did not show up for their overtime shifts, and "there could have been a

reason" since "I guess we all have emergencies at times." (J.A.345-347). Plaintiff also testified that he was aware two (2) Black officers, Officers Oliphant and Cotton, and one unnamed biracial female officer, that committed similar overtime violations as the Caucasian Officers. (J.A.347-350). Although Henville claimed he did not know whether they were disciplined (J.A.349, 350-352), MTA provided proof that such Black or Officers did not receive any overtime–related discipline -- similar to the Caucasian officers Plaintiff was comparing himself to. (J.A.512-513). MTA argued that the evidence of Black Officers committing overtime violations and not being disciplined undermined any inference that the discipline of Plaintiff for such a violation was motivated by race. (J.A.543-544).

### E.    Removal of Plaintiff's Summons-Writing Responsibilities

On or about March 12, 2012, Plaintiff was informed by Lt. Yasso at the direction of Capt. Kieran that he could no longer write summonses. (J.A. 71; 358-359; 545. 559; 686-687). This restriction was the culmination of a four-year period wherein Plaintiff was disciplined or reprimanded multiple times for summons-related offenses. (J.A.544-545). Prior to March 12, 2012, Plaintiff was disciplined or reprimanded for at least seven (7) summons-related infractions over such period (J.A.544-545), including failing to accurately document summonses he had written (J.A. 523); failure to document and record Vehicle Traffic Law summonses (J.A. 166; 438-441); failing to document summonses in his memobook and failing to notify the Communication Unit after traffic stops (J.A.166-167; 444-447); and being required to

11

write a memo on why he had issued three summonses to a wheel chair bound individual. (J.A. 166).

The MTA's reasons for the removal of Henvill's summons-writing responsibilities on March 12, 2012 were provided by Capt. Kieran in his Declaration, which stated that such removal occurred because of: a.) Henvill's progressive disciplinary history related to his issuance of summonses; b.) Henvill's issuance of summons in situations where he was instructed to do other duties and responsibilities; and c.) Henville's conduct of consistently and repeated disregarding instructions from supervisors, including Capt. Kieran, regarding the issuance of summonses. (J.A.55-56).

Plaintiff bases this portion of his retaliation claim solely on the fact that he filed a Charge of Discrimination with the EEOC in January 2012, only two months before his summons–writing authority was removed in March 2012. (J.A.559-560). Plaintiff contends that a prima facie claim of retaliation was stated because his summons-issuing authority was removed by Capt. Kieran, his Commanding Officer at District 3, only two months after he first complained to the EEOC, and Capt. Kieran must have known of his EEOC complaint because a Notice of Claim was sent to Kieran and the MTA at the MTA's corporate address, and "everyone in Jamaica knew." (J.A.559-560; 718-719).

Plaintiff's retaliation arguments failed to address Plaintiff's significant prior summons-related history, other than to argue that he was not told that such history

12

was the reason for his discipline.  (J.A.559).  Instead, despite his documented history,

he made the unsupported claims that he "did not have prior issues with writing

summonses" and there were "other police officers who abused their summons issuing

authority and who were not disciplined." (J.A.559-560).  Plaintiff identified no

specific officers who abused their summons authority and were not disciplined.

(J.A.560).

With respect to Capt. Kieran's knowledge of the EEOC complaint, Kieran's

Declaration also included his sworn statement that at the time he made the decision to

remove Henvill's summons-writing responsibilities, he was not personally aware that

Henvill had filed a Charge of Discrimination.  (J.A.55-56).

### F.    Plaintiff's Termination

On April 19, 2013, Plaintiff knowingly took possession of another officer's

memobook that was left on top of a gun locker, and then locked the memobook inside

the gun locker.  (J.A.366-367; 546).  A memobook is a notebook provided to all

(MTAPD) Officers and other members of the MTAPD to record all police activity,

including traffic stops and summonses. (J.A.525; 546).  A Police Officer's memobook

is an important document that often is used in court and administrative hearings to

document a Police Officer's activity.  (J.A.525; 546).

Subsequently, on April 26, 2013, Sgt. James Sokira asked Plaintiff if Plaintiff

had found Sokira's missing memobook, and Plaintiff responded that he had not seen it.

(J.A.367-368; 546).  During this exchange with Sgt. Sokira, a superior officer, Plaintiff

failed to mention that he had taken possession of an unidentified memobook a few days before, and locked it in a gun locker on such date.  (J.A. 525, 546; 624-628).

The MTA IAB conducted an investigation relating to the whereabouts of Sgt. Sokira's memobook. (J.A.546-547; 659-682).  On June 3, 2013, in connection with its investigation, IAB interviewed Plaintiff and asked him if he had a recollection of observing or placing Sgt. Sokira's memo book inside a gun locker on April 19th.  (J.A. 547; 626-628).   In response, Plaintiff indicated that he did not recall observing or placing Sgt. Sokira's memobook inside a gun locker.  (J.A. 626-628).  In a follow-up question, Plaintiff was asked whether he had "any recollection of picking up *a memobook* from the top of the gun locker, opening it up, looking at the front pages of the memobook then locking it into a gun locker," and he responded "[n]o sir." (J.A.375-379; 547).

However, during the course of the investigation, IAB showed Henvill a video that depicted him taking possession of the memobook and locking it inside a wall mounted gun locker, and Henvill admitted to such conduct.  (J.A.526; 560).  Plaintiff testified that he looked inside the memobook and did not see any identifying markings, and therefore, had no idea the memobook belonged to Sgt. Sokira.  (J.A. 560; 621-623).  At his deposition, when asked if his answers to IAB's questions about whether

14

he took possession of a memobook and placed it in a gun locker were truthful, he responded "Correct." (J.A.629).[3]

Following IAB's investigation, MTA issued a Notice of Intent to Discipline to Plaintiff. (J.A.449-450). The June 17, 2013 Notice of Intent to Discipline alleged: (1) Henvill engaged in "conduct prejudicial to good order, efficiency or discipline" by being "captured on video taking possession of Sgt. Sokira's memobook and locking it inside a wall mounted gun locker"; (2) Henvill engaged in such conduct by providing a "less than truthful" response to Sgt. Sokira's questions as to whether he had seen his memobook; and (3) Henvill made a "false or misleading entry" in his oral report to IAB and omitted relevant information when he told IAB he had no recollection of observing Sokira's memobook or locking it in the gun locker. (J.A.449-450).

Following the issuance of the June 17, 2013 Notice of Intent to Discipline, the matter was submitted to binding arbitration pursuant to the terms of the Collective Bargaining Agreement. (J.A.452-460). On April 24, 2015, after the completion of the arbitration, the Arbitrator, Martin F. Scheinman, Esq., determined that the MTA had "just cause" to terminate Plaintiff's employment as a result of Plaintiff's actions

---

[3] Plaintiff was asked: "You believe you were completely truthful when you stated you had no recollection of picking up *a memobook* from the top of a gun locker, opening it up, looking at the front two pages of the memobook, then locking it into the gun locker and you said "no," you believe you were being completely truthful with that answer (emphasis added)?" Plaintiff's response was: "Correct." (J.A.629).

on April 19, 2013, April 26, 2013, and June 3, 2013, relating to the disappearance of Sgt. Sokira's memobook and the resulting investigation.  (J.A.462-481).

The Arbitrator found that Plaintiff, by being untruthful, demonstrated that he could no longer be relied upon to provide accurate or truthful evidence on matters being investigated.  (J.A.549).  The arbitrator concluded that Henvill had "irreparably" damaged his ability to continue performing the essential functions of a police officer when he falsely denied any recollection of his actions with regards to taking Sgt. Sokira's memobook and placing it in a gun locker.  (J.A.477-478; 549-550).

Specifically, the Arbitrator found:

> "It is … fundamental Police Officers must be truthful when providing information during investigations.  These standards are essential to the proper functioning of the Authority's Police Department in delivering police protection to members of the public.  When a Police Officer fails to meet these standards, he or she becomes subject to discipline.  The amount of discipline must be proportionate to the proven offense and consistent with the principles of discipline.  (J.A. 470-471; 549-550).

> ****

> By falsely denying any recollection of picking up Sokira's memo book and locking it inside a gun locker, Henville committed serious misconduct, which, I find, compromised his ability to continue serving as a Police Officer… When a Police Officer answers questions in a purposely untruthful or evasive manner during an official investigation, it is fundamental his or her ability to continue serving is compromised.  By lying to Internal Affairs, Henvill demonstrated he can no longer be relied upon to provide accurate or truthful evidence on matters being investigated.  (J.A. 478; 549-550).

The arbitrator also stated he did not agree that Henvill's prior record "involve[d] only minor offenses." (JA.478; 529). He noted three prior offenses by Henvill where significant discipline was imposed, including: a.) 48-hour suspension for leaving a fellow officer unaccompanied on December 10, 2011; b.) a 90-hour suspension for accepting an overtime assignment on November 29, 2011, when his overtime polling [eligibility] was forfeited; and c.) a loss of 24-hours of accrued time for failing to turn in summonses upon completion of two tours in 2012, as required by an Agreement he had signed. (J.A.479; 529).

The Arbitration Award found Henvill guilty of each of the charges and specifications cited, and further found "just cause" for his termination and denied the PBA's grievance relating to Henvill's termination. (J.A.481). Following issuance of the arbitrator's Decision and Award, the MTA terminated Plaintiff's employment, effective April 29, 2015. (J.A.483).

On July 24, 2015, Plaintiff filed a Petition in New York State Supreme Court against the MTA and the Police Benevelent Association ("PBA") seeking to vacate the arbitration Decision and Award issued on April 24, 2015. (J.A.415-423). The MTA and PBA both moved to dismiss the Petition, and on January 22, 2016, Supreme Court (Hon. Joan M. Kenney) granted the MTA's and PBA's respective motions to dismiss. (J.A.425).

On November 1, 2016, Plaintiff filed an appeal of Supreme Court's order granting the MTA's and PBA's respective motions to dismiss. On March 9, 2017, the

17

Supreme Court, Appellate Division, First Department, unanimously affirmed Supreme Court's order on the respective motions to dismiss, and stated that it perceived "no reason to overturn the imposed penalty of termination." (J.A.427-430).

### G. Disparate Treatment Allegations Relating To Termination

In support his claims that he was terminated because of his race and as retaliation for filing a Charge of Discrimination with the EEOC ("EEOC Complaint"), Plaintiff argued that several Caucasian Police Officers identified in his Second Amended Complaint ("SAC") who have not engaged in protected activity and have committed far more egregious acts than that which Plaintiff was accused of, have not been terminated. (J.A.72-73; 552, 562; 635-653). The Caucasian officers listed by Plaintiff, however, did not engage in conduct similar to that for which Plaintiff was terminated (i.e., being untruthful during an IAB investigation), but rather committed acts including sleeping on duty, DWI violations, improper use of an MTA vehicle and domestic incidents, most of which resulted in disciplinary action short of termination. (J.A.635-653; 720-721). Plaintiff did not submit any first-hand, non-hearsay evidence establishing that any of the listed Caucasian officers did not receive discipline for their infraction, or that they had disciplinary histories comparable to his own. (J.A.345-356; 562-563). Thus, Plaintiff submitted no direct or inferential evidence to support his claim that he was terminated because of his race or as retaliation for engaging in protected activity.

Plaintiff's attempt to demonstrate disparate treatment was based on a group of ill-fitting comparators. Plaintiff identified eleven (11) Caucasian MTA Officers as "comparators." (J.A.383-402; 706). First, Officer Fitzpatrick handcuffed a young man found urinating on a church, transported the offender to another location without reporting it to MTA, and turned the young man over to local officers who brought him home. (J.A.384-385:706). Fitzpatrick also was alleged to have stolen newspapers from a Penn Station vendor. (J.A.706). Fitzpatrick was disciplined, but not terminated, for failing to notify MTA of police action and the transport of the young man. (J.A.706, 720). There is no evidence in the record of Fitzpatrick's prior disciplinary history.

Officer Gentile was investigated for the fatal shooting of a Nassau County Police Officer, but the investigation yielded no evidence of criminal conduct, and Gentile was neither prosecuted nor disciplined. (J.A.383-384; 706, 721). There is no evidence in the record as to Gentile's prior disciplinary history.

Officer Doscher, discussed above, allegedly had two separate incidents of improper use of a MTA vehicle, but was demoted from Detective to Police Officer for these and other actions. (J.A.385-387; 706; 721). There is no evidence of any other prior disciplinary offenses by Office Doscher.

Officers Buehler and Stallone were allegedly caught sleeping at their post, but MTA had no record of either incident, and therefore, neither officer was disciplined. (J.A.387-388; 707; 721). Sergeant Smith also allegedly was found sleeping and was

19

not disciplined. (J.A.388-389). There is no evidence of any prior disciplinary history for any of these three officers.

Officer Lucchesi was alleged by plaintiff to have broken an "aided bench" at the Flatbush District office, which allegedly was caught on video, and he then was untruthful when asked about it. (J.A.389-391; 707; 720-721). However, MTA reported during discovery that no disciplinary charges were brought against Lucchesi due to the lack of evidence, and MTA represented that no video or record existed of the alleged incident. (J.A.389-391; 707; 720-721). No evidence exists of any prior disciplinary record for Lucchesi.

Plaintiff alleges that Officer LeBlanc was arrested for felony DWI, but was only temporarily suspended and was allowed to drive MTA vehicles allegedly without valid driving privileges. MTA responded in discovery that Officer LeBlanc pled guilty to misdemeanor DWI, and was suspended for his misconduct. (J.A.391-392: 707, 721).

Plaintiff alleged that Officer Davis was asleep on the job, and when he was photographed by a fellow officer who refused to delete the photo, Davis pointed his gun at the officer in possession of the photo. MTA confirmed that Davis was suspended, but not terminated, for this conduct. (J.A.393-393; 707, 721). The record shows Davis' prior disciplinary history was related to sleeping incidents. (J.A.399-400).

Plaintiff alleged that Officer Chadderton was arrested for felony DWI, and was temporarily suspended and continued to drive MTA vehicles. MTA confirmed that this officer was suspended, but then retired shortly thereafter. (J.A. 393-397; 707 721).

Officer Ojeda allegedly was on modified duty due to a domestic incident with his wife, and provided false information to a supervisor as to his whereabouts in New Jersey, where his wife lived. MTA reported that Ojeda was terminated for his misconduct. (J.A.273; 707, 721).

Henvill was asked at his deposition whether he knew about any of the identified officers' prior disciplinary histories. (J.A.397-401). Henvill responded that Officers Chadderton and LeBlanc had at least two drunk driving incidents, but provided no evidence as to the discipline imposed other than his deposition testimony. (J.A.398). Doscher also allegedly had two incidents using an MTA vehicle for personal use, but again, there was no evidence as proof other than Henvill's testimony based on gossip from "other officers." (J.A.398-399). According to Plaintiff, Davis had some disciplinary history "because he slept a lot." (J.A.399-400). Henvill conceded that he had no knowledge of any prior disciplinary histories for Fitzpatrick, Gentile, Lucchesi, Buehler, Stallone and Smith. (J.A.398-399).

### H. Procedural History

On or about January 11, 2012, Plaintiff filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ( "EEOC Complaint") against the MTA alleging discrimination based on his race and color. (J.A.62-64). On May 5,

21

2012, Plaintiff filed a Supplemental Charge of Discrimination with the EEOC alleging discrimination based on his race and color, as well retaliation based on the January 11, 2012 Charge of Discrimination he previously had filed with the EEOC.  (J.A.68-69).

On October 24, 2013, Plaintiff filed a Verified Complaint with the United States District Court for the Southern District of New York (the "District Court") against the MTA and nine individual defendants (the "Individual Defendants") (the "District Court Complaint").  (J.A.82-99).  In the District Court Complaint, Plaintiff alleged claims of race-based discrimination, retaliation, hostile work environment, and retaliatory hostile work environment in violation of Title VII, ("NYSHRL"), and "NYCHRL", as well as 42 U.S.C. §§ 1981 and 1983. (*Id.*)

On July 9, 2014, the District Court (Hon. George B. Daniels, U.S.D.J.), granted the Individual Defendants and the MTA's motion to dismiss and permitted Plaintiff to request leave to amend the District Court Complaint.  (J.A.100-156).  On August 7, 2014, Plaintiff filed a Notice of Appeal from the dismissal of the District Court Complaint.  (J.A.157-159).

On August 11, 2014, Plaintiff requested leave to amend the District Court Complaint and attached to this request a proposed amended complaint that named the MTA as the sole defendant, and only asserted claims under Title VII, NYSHRL and NYCHRL.  (J.A.160-179).  On October 10, 2014, the District Court denied Henvill's request for leave to amend the District Court Complaint and dismissed Plaintiff's Title VII claims. (J.A.180-188).  Although the District Court dismissed Plaintiff's Title VII

claims for race-based discrimination, hostile work environment, retaliation, and retaliatory hostile work environment, the District Court declined to exercise supplemental jurisdiction over Henvill's remaining claims under NYSHRL and NYCHRL. (J.A.182-188).

On November 14, 2014, Plaintiff appealed from the District Court's July 9, 2014 judgment granting the Individual Defendants and the MTA's motion to dismiss, as well as the District Court's October 10, 2014 judgment denying Plaintiff's request for leave to amend the initial District Court Complaint.

On December 8, 2014, while his appeal was pending with the United States Court of Appeals for the Second Circuit (the "Second Circuit"), Plaintiff filed a Verified Complaint against the MTA in New York State Supreme Court (the "State Court Action") alleging claims of race-based discrimination, retaliation, hostile work environment, and retaliatory hostile work environment pursuant to the NYSHRL and the NYCHRL based on the same set of facts underlying the District Court action. (J.A. 189-205).[4]

On May 11, 2015, the Second Circuit issued a Summary Order affirming the District Court's July 9, 2014 judgment, affirming in part and vacating in part the District Court's October 10, 2014 judgment, and remanding the matter to the District Court "for further proceedings consistent with [the Summary Order]." (J.A.206-210).

_____

[4] On December 13, 2017, the State Court action was eventually dismissed with prejudice by way of Stipulation of Discontinuance. (J.A.274).

In the Summary Order, the Second Circuit stated that:

> [a]s for Henvill's request for leave to amend, which the District Court denied on the ground that the proposed amended complaint ("PAC") would not survive a motion to dismiss, we affirm the ruling as to most of Henvill's Title VII claims.

(J.A.208-209).

With respect to the portion of the District Court's October 10, 2014 judgment that the Second Circuit vacated, the Second Circuit stated that:

> the District Court erred in denying Henvill's request for leave to amend as it pertained to the race-based discrimination claim regarding the command discipline issued by Lee Dittrich and the retaliation claim regarding the removal of Henvill's summons-issuing responsibilities.

(J.A.209-210).

Therefore, except with respect to Plaintiff's allegations related to: (1) Plaintiff's race-based discrimination claim regarding a Command Discipline issued by Lee Dittrich for accepting two tours of overtime in different districts on the same day; and (2) Plaintiff's retaliation claim regarding the removal of his summons-issuing responsibilities, the Second Circuit agreed with the District Court that "Plaintiff has insufficiently alleged [in the proposed amended complaint] a plausible cause of action for race-based discrimination, hostile work environment, retaliation, or retaliatory hostile work environment. (J.A.207-210).

On July 17, 2015, Plaintiff filed an Amended Verified Complaint in the District Court (the "District Court Amended Complaint"). (J.A.229-241). In the District Court Amended Complaint, in addition to the Title VII race-based and retaliation claims related to his April 2015 termination, Plaintiff alleged only the facts that the Second Circuit held were sufficient to support Plaintiff's claims under Title VII: (1) Plaintiff's race-based discrimination claim regarding a command discipline issued by Lee Dittrich related to Plaintiff accepting two tours of overtime on the same day in different commands; and (2) Plaintiff's retaliation claim regarding the removal of his summons-issuing responsibilities. (J.A.229-242).

On November 29, 2017, Plaintiff filed a Second Amended Verified Complaint in the District Court (the "District Court Second Amended Complaint"). (J.A.65-81). In the District Court Second Amended Complaint, Plaintiff alleged; a) Title VII, NYSHRL, and NYCHRL race-based discrimination and retaliation claims related to his termination, (b) Plaintiff's race-based discrimination claim under Title VII, NYSHRL and NYCHRL regarding a command discipline issued by Lee Dittrich related to Plaintiff accepting two tours of overtime on the same day in different commands; and (c) Plaintiff's retaliation claim under Title VII, NYSHRA and NYCHRA regarding the removal of his summons-issuing responsibilities. (J.A. 65-81).

25

Accordingly, as Plaintiff concedes (J.A.540-541), the only claims to be considered in connection with this action and appeal are those set forth in the District Court Second Amended Complaint, namely:

> a. Plaintiff's Title VII, NYSHRL, and NYCHRL race discrimination claim regarding the command discipline issued by Lee Dittrich related to Plaintiff accepting two tours of overtime in different commands on the same day;
>
> b. Plaintiff's Title VII, NYSHRL, and NYCHRL retaliation claim regarding removal of Plaintiff's summons-issuing responsibilities; and
>
> c. Plaintiff's Title VII, NYSHRL, and NYCHRL race and retaliation claims related to his termination.

(J.A.65-81).

## I.    District Court Order and Judgment Appealed From

In March 2021, MTA moved for summary judgment and Plaintiff submitted opposition. (J.A. 53-61; 514-534). MTA argued that Plaintiff had failed to make prima facie showings of race-based discrimination or retaliation under Title VII, NYSHRL and NYCHRL. MTA further argued that even assuming Plaintiff had made both prima facie showings, he failed in his ultimate burdens of demonstrating that, based on the evidence submitted, a rational trier of fact could find that MTA's legitimate, non-discriminatory and non-retaliatory reasons for disciplining and terminating him were either pretextual, or that "but for" MTA's retaliatory motive (allegedly triggered by Plaintiff's two EEOC Complaint), Plaintiff would not have been disciplined and terminated.

In opposition, Plaintiff attempted to establish an inference of discrimination based on the disparate treatment he allegedly received from the MTA as compared to Caucasian Officers who were "similarly situated" with him. (J.A. 535-565). On the retaliation claims, Plaintiff relied heavily on the temporal proximity between his protected activity and MTA's adverse employment actions of removing his summons responsibilities and terminating him. (J.A.555-563).

In a 12-page written Memorandum, Decision and Order, dated September 26, 2022, the District Court granted MTA's motion for summary judgment dismissing all claims asserted by Henvill. (J.A.782-793). With respect to both the race-based discrimination and retaliations claims, the District Court held that Plaintiff had failed to make a prima facie showing, and even if he had, Plaintiff failed to produce any evidence that his race or retaliation was a motivating factor in the adverse employment actions taken against him, including his termination. The District Court's subsidiary holdings are described below.

First, the District Court addressed the Title VII and NYSHRL race-based discrimination claims involving two separate incidents involving Henvill: a.) the November 9, 2011 Command Discipline issued to him for accepting two conflicting tours of overtime, and b.) the June 7, 2013 Notice of Intent to Discipline for being untruthful during the IAB Investigation, which led to his termination in April 2015. (J.A.787). The Court held that notwithstanding Plaintiff's efforts to raise an inference of race discrimination by comparing his disciplinary treatment to that of

other mostly Caucasian MTA employees who allegedly committed similar infractions, Henvill failed to meet this fourth prong of his prima facie showing for two reasons -- namely, he failed to produce any "competent evidence showing the specific misconduct in which these alleged comparators were involved or the discipline they received," and given this failure, he failed to establish that the alleged "comparators" were "similarly situated" to him. (J.A.790).

The District Court held that Plaintiff's comparisons were inapt and legally insufficient because: a) accepting two tours of overtime on the same day and missing an assignment were "qualitatively different"; b) the evidence showed that Plaintiff's comparators also included Black Officers who were not disciplined for similar offenses, which undermined any inference of racial animus on MTA's part; and c) Plaintiff had failed to show that "his comparators ha[d] the same progressive disciplinary history" as he did. (J.A.790).

Based on these specific conclusions relating to all claims of discrimination, the Court also found that Plaintiff's disparate treatment evidence also failed to make a prima facie showing under the lower NYCHRL standard, which requires a showing that the plaintiff was treated "less well" because of his or her race. (J.A.791).

Second, with respect to the retaliation claims under Title VII, NYSHRL and NYCHRL, the District Court found causation as a legal roadblock to plaintiff's attempt to establish a prima facie case. Plaintiff's final pleadings alleged two (2) adverse employment actions that allegedly were motivated by an intent to retaliate

against Henvill for his protected activity: (1) the 2012 removal of Henvill's summons-issuing authority, and (2) the 2013 Notice of Intent to Discipline relating to Plaintiff's untruthfulness during the IAB investigation.

With respect to the removal of Plaintiff's summon-issuing authority, the District Court found as a matter of fact that the decision-maker, Capt. Kieran, was not aware of Plaintiff's EEOC complaints at the time he made the determination to remove Henvill's summons issuing authority. ( J.A.792). Although Henvill disputed this fact, Captain Kieran, submitted a sworn affidavit denying any knowledge of Plaintiff's EEOC complaint, while Plaintiff relies on general "office knowledge" and his own assumptions about what Captain Kieran knew. (J.A.791-792). Given Captain Kieran's proof of his lack of knowledge of this protected activity, the District Court held that there was no causal connection as a matter of law. (J.A.792).

Regarding Plaintiff's 2013 discipline and resulting 2015 termination for untruthfulness during the memobook investigation, the district court held that even assuming Plaintiff could establish a prima facie case of retaliation, he failed at the third prong of the McDonnel Douglas test because MTA had provided a "legitimate, non-discriminatory reason to terminate him (his untruthfulness during the IAB investigation)," and Henvill had failed to raise a jury question that such reason was pretextual or retaliatory. (J.A.792-793).

As the District Court noted, because the arbitrator found that Henvill's dishonesty during the IAB investigation into the missing memobook was "just cause"

for his termination, such limited finding was entitled to collateral estoppel treatment, as conceded by Plaintiff's counsel at oral argument. (J.A.792-793). Although the District Court recognized that this collateral estoppel finding did not preclude Plaintiff from making a showing of pretext. (J.A.793), the court held that no such showing was made here, since Plaintiff relied on subjective beliefs and speculation rather than proven facts demonstrating disparate treatment of Caucasian and Black Officers at MTA. (J.A.793).

Upon dismissing all of Plaintiff's causes of action in the SAC, the court entered Judgment dismissing the action and closing the case. (J.A.794).

## SUMMARY OF ARGUMENT

In this employment discrimination action alleging race-based discrimination and retaliation, Plaintiff Winston Henvill added to his long history of disciplinary offenses by accepting two conflicting overtime tours, abusing his summons-issuing authority and, finally, lying to IAB investigators about his role in a fellow officer's missing memobook investigation. While most meritorious discrimination cases arise out of a compellingly close question about whether the defendant's motives were discriminatory or not, this case does not. Plaintiff's prior disciplinary history and egregious misconduct involving dishonesty leave no question that MTA had legitimate reasons for disciplining and terminating him. The District Court properly granted summary judgment to MTA and dismissed all claims.

Because Plaintiff's attempt to show disparate treatment between himself and purportedly similarly situated non-Black officers was ineffective due to his reliance on unreliable hearsay proof and ill-fitting comparators, the Court properly found no prima facie case of discrimination, and even if a prima facie case was shown, that Plaintiff failed to submit sufficient evidence to raise a jury question as to whether MTA's articulated reasons for disciplining and terminating Plaintiff were pretextual.

The Court also properly dismissed the retaliation claims due to Plaintiff's failure to show a causal connection between Plaintiff's protected activity in filing complaints with the EEOC and his discipline and termination. Plaintiff relies solely on temporal proximity for at least one portion of his retaliation claim (removal of his

31

summons authority), but the law is clear that temporal proximity alone is not sufficient to show a causal connection, especially in circumstances where, as here, the plaintiff's progressive disciplinary history commenced and continued long before the protected activity occurred. Because Plaintiff's lengthy disciplinary history and egregious act of lying to IAB investigators provided a clear and inevitable path to his ultimate termination, he has failed to make the required causal showing that "but for" MTA's alleged retaliatory motive, Plaintiff would not have been disciplined and terminated.

As for Plaintiff's NYCHRL claims, Plaintiff failed to make any substantive arguments in his Brief as to why these claims were erroneously dismissed, and therefore, he has abandoned them. This Court should affirm the order and judgment of the district court.

## ARGUMENT

I.   **PLAINTIFF'S RACE DISCRIMINATION CLAIMS WERE PROPERLY DISMISSED BECAUSE PLAINTIFF FAILED TO MAKE A PRIMA FACIE SHOWING OF RACE DIS-CRIMINATION BY DISPARATE TREATMENT EVIDENCE OR OTHERWISE, AND EVEN IF HE DID, HE MADE NO FURTHER EVIDENTIARY SHOWING THAT MTA'S LEGITIMATE, NON-DISCRIMINATORY REASONS FOR PLAINTIFF'S DISCIPLINE AND TERMINATION WERE FALSE AND PRETEXTUAL**

### A.   Standard of Review

This Court "review[s] *de novo* an award of summary judgment, 'resolv[ing] all ambiguities and draw[ing] all reasonable inferences in the light most favorable to the nonmoving party.'  Summa v. Hofstra Univ., 708 F.3d 115, 123 (2d Cir 2013])."  Valentia Villetti, Faiza Jabril, M.D. v. Guidepoint Global LLC, --F.4th--, 2022 U.S. App. LEXIS 18651 at *2.  "Summary judgment is appropriate only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'  Fed. R. Civ. P. 56(a).  A genuine dispute exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  Gorzynski v. JetBlue Airways Corp.,596 F.3d 93, 101 (2d Cir. 2010)."  Valentia Villetti, Faiza Jabril, M.D. v. Guidepoint Global LLC, --F.3d--, 2022 U.S. App. LEXIS 18651 at *2.

[W]herefore the nonmoving party will bear the burden of proof on an issue at trial, the moving party may satisfy its burden [on summary judgment] by pointing to

an absence of evidence to support any essential element of the nonmoving party's case." Crawford v. Franklin Credit Mgmt. Corp., 758 F.3d 473, 486 (2d Cir. 2014).

### B. Plaintiff's Appellate Arguments On Race Discrimination Claims

Plaintiff offers several arguments on appeal to challenge the district court's dismissal of his race discrimination claims under Title VII, NYSHRL and NYCHRL. He acknowledges, however, that based on the district court's and this Court's prior decisions in this case, the race discrimination claims are limited to two (2) instances of adverse employment actions: (1) the November 9, 2011 "Command Discipline" issued to Henvill for accepting two conflicting tours of overtime, and (2) the June 17, 2013 Notice of Intent to Discipline and subsequent termination relating to Plaintiff's untruthfulness during that the IAB investigation. (JA.540-541).

Plaintiff's discrimination-based appellate arguments include: a) Plaintiff established a prima facie case of race discrimination by submission of proof that raised an inference of discrimination; b) Plaintiff submitted sufficient evidence of the disparate treatment between himself and "similarly situated" Caucasian MTA Officers, whereby such Caucasian Officers either were not disciplined or received less harsh discipline than him for the same or similar misconduct; (c) the District Court erred in finding that the Caucasian Officers that he compared himself to were not "similarly situated"; and (d) the District Court erred in rejecting plaintiff's evidence as "incompetent" and based solely on his deposition testimony with regard to his belief that the comparators committed infractions but were not disciplined. The

District Court adequately addressed each of these arguments below and correctly found that no valid discrimination claim exists.

### C.    Applicable Law on Race Discrimination Claims

"Discrimination claims under Title VII, 42 U.S.C. § 2000e-2(a)(1), 42 U.S.C. § 1981(a), and the NYSHRL, N.Y. Exec. L. § 296(1)(a), are analyzed under the <u>McDonnell Douglas</u> burden-shifting framework. <u>See McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 312 (2d Cir. 2015) (Title VII and § 1981); <u>Spiegel v. Schulmann</u>, 604 F.3d 72, 80 (2d Cir. 2010) (NYSHRL)." <u>Zheng-Smith v. Nassau Health Care Corp.</u>, --F.4[th]--, 2021 U.S. App. LEXIS 27084 at *2 (2d Cir.).

"First, the plaintiff must 'establish a <u>prima facie</u> case of discrimination by showing that: (1) []he is a member of a protected class; (2) []he is qualified for h[is] position; (3) []he suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination.' <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 83 (2d Cir. 2015) (quotation marks omitted)." <u>Zheng-Smith v. Nassau Health Care Corp.</u>, 2021 U.S. App. LEXIS 27084 at *2. The burden on a plaintiff to establish a prima facie case of discrimination under Title VII has been described as a "minimal" one. <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 38 (2d Cir. 2000), citing <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506, 125 S.Ct. 407 (1993).

Once an employee has demonstrated a prima facie case, '[t]he burden then shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the disparate treatment. <u>Id.</u> (quoting <u>McDonnell Douglas Corp.</u>, 411 U.S. at 802). <u>Zheng-Smith v. Nassau Health Care Corp.</u>, --F.4th--, 2021 U.S. App. LEXIS 27084 at **2-3. "If the employer articulates such a reason for its actions, the burden shifts back to the plaintiff to prove that the employer's reason was in fact pretext for discrimination." <u>Id.</u> (quotation marks omitted). <u>Zheng-Smith v. Nassau Health Care Corp.</u>, 2021 U.S. App. LEXIS 27084, at *2-3.

With respect to the fourth prong of the prima facie standard, Plaintiff Henvill argues that similarly situated Caucasian employees were treated differently than him, raising an inference of race-based discrimination. "A showing of disparate treatment -- that is, a showing that an employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group' -- is a recognized method of raising an inference of discrimination for the purposes of making out a prima facie case." <u>Mandell v. County of Suffolk</u>, 316 F.3d 368, 379 (2d Cir. 2003); <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000).

"An employee is similarly situated to co-employees if they were (1) "subject to the same performance evaluation and discipline standards" and (2) "engaged in comparable conduct." <u>Graham v. Long Island R.R.</u>, 230 F.3d at 40. "[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both

cases are identical." *Id.* "In other words, the comparator must be similarly situated to the plaintiff 'in all material respects.'" Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997)." See Radwan v. Manuel, 55 F.4th 101, 132-141 (2d Circ. 2022); Ruiz v. County of Rockland, 609 F.3d 486, 493-494, 2010 U.S. App. LEXIS 13058, *16-17.

### D. Plaintiff's Disparate Treatment Evidence Failed To Raise An Inference of Intentional Discrimination By MTA

Plaintiff alleges that he was discriminated against by MTA in two instances: first, the 2011 Command Discipline for willingly accepting two conflicting tours of overtime; and second, the 2013 the Notice of Intent to Discipline for being untruthful during an IAB investigation into a missing memobook and subsequent termination. Plaintiff relies almost entirely on a disparate treatment theory, arguing that Caucasian officers who committed similar infractions as him were not disciplined or terminated. However, Henvill's disparate treatment theory breaks down due to his failure to submit sufficient evidence showing that Plaintiff was "similarly situated" with the purported Caucasian comparators.

As demonstrated below, Plaintiff was not similarly situated with the "comparator" officers he identifies because: (1) he committed violations that were not of comparable seriousness with the comparators; (2) his evidence that the comparators committed similar offenses, and were not disciplined or terminated, was based on hearsay and office gossip, not first-hand evidence; and (3) he offered no

non-hearsay evidence of the alleged comparators' prior disciplinary histories, making any comparison with Plaintiff impossible or speculative.

### (1)    Disparate Treatment Evidence For Overtime Violations

Plaintiff argues that with respect to the Command Discipline he received for accepting two conflicting tours of overtime, the acts committed by his comparators -- not showing up for an overtime tour, or showing up late or leaving early from an overtime tour -- were essentially the same acts, because they also resulted in one command being understaffed and another officer being deprived of an overtime opportunity. (J.A.70-71; 558; 592-596; 597-601; 602-607). The District Court disagreed with Plaintiff and found that none of plaintiff's alleged comparators on the overtime-violation issue were similarly situated to him. (J.A.790-791).

Unequal treatment of similarly-situated employees is the touchstone of the disparate treatment theory, and the district court correctly found that Plaintiff failed to adduce sufficient competent, non-hearsay evidence that he was similarly situated with MTA Police Officers Torone, Doscher, Scheck and Pfeiffer or any others with respect to overtime violations. (J.A.790-791). First, the court correctly concluded that accepting two tours of overtime was "qualitatively different" than merely missing or arriving late for an assignment, since as MTA argued, it involved the staffing of two command districts, not just one. (J.A.522). Moreover, accepting two tours of overtime for the same day clearly raises concerns of officer dishonesty, since a jury

could reasonably find that Plaintiff was untruthful about accepting two overtime tours "unintentionally." (J.A.557-558).

Second, the court also relied on the fact that plaintiff's purported "evidence" of the comparators' similar offenses and their lack of discipline was based solely on plaintiff's own deposition testimony, without any objective evidence demonstrating that Plaintiff had a basis for his knowledge of these matters beyond mere office gossip. See Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (evidence offered to establish that purported comparators are similarly situated cannot be based on "common knowledge").

It is well-established in this Circuit that a plaintiff cannot establish a prima facie case with only purely conclusory allegations of discrimination absent any concrete particulars." Valentia Villetti, Faiza Jibril, M.D. v. Guidepoint Global, LLC, 2022 U.S. App. LEXIS 18651 at *7, citing Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985); see Bentley-Ammonds v. Northwell Health, Inc., 2022 U.S. App. LEXIS 7999 at *6-7 (rejecting plaintiff's disparate treatment argument where the plaintiff's allegations that co-employees engaged in similar misconduct without adverse consequences "were conclusory and based on inadmissible hearsay"). As the district court correctly recognized, Plaintiff himself testified that his purported knowledge of the alleged comparators not being disciplined for overtime violations was based on "word going around" and "hearsay," and as such, it was insufficient to establish that the comparators were similarly situated. (J.A.345-349).

Third, Plaintiff has failed to demonstrate with actual evidence that his alleged comparators regarding overtime violations shared a similar prior disciplinary history to render them similarly situated.  See Saji v. Nassau Univ. Med. Ctr., 724 F. App'x 11, 18 (2d Circ. 2018) (affirming grant of summary judgment where plaintiff "put[] forward no concrete evidence" to show comparator had same "sort of disciplinary history").  Plaintiff testified that he had no evidence that Officers Torone, Scheck, Pfeiffer had any prior disciplinary history.  (J.A.330, 340-342; 604-605).  Although Plaintiff did testify at his deposition that one of the overtime comparators, Officer Doscher, had two infractions for speeding and improper use of an MTA vehicle, (J.A.337-338) MTA's submissions in response to the Doscher allegations demonstrated that Doscher was demoted after such violations, and therefore, like Plaintiff, he was disciplined.  (J.A.721).

Because Plaintiff failed to meet his burden of showing that he was similarly situated to the identified comparators in terms of prior disciplinary histories, the district court property rejected the disparate treatment claim  as to the November 2011 Command discipline for accepting two conflicting tours of overtime,  see Ruiz v. County of Rockland, 609 F. 3d at 499; see also Toussaint v. N.Y. Dialysis Servs., 230 F.Supp.3d 198 (SDNY 2017) ("[c]ourts in the Second Circuit have routinely recognized that a materially dissimilar disciplinary history may disqualify a peer employee from being deemed similarly situated to a plaintiff"); McKinney v. Bennett, 2009 U.S. District LEXIS 84713 (SDNY 2009) (no reasonable jury could

find that the plaintiff was similarly situated to white troopers he compared himself to because he failed to show comparable disciplinary histories, or any history at all).

In sum, given Henvill's lengthy disciplinary history over the course of 14 years, no reasonable juror could find that Plaintiff's discipline of the loss of 18 hours of time for willingly taking two overtime tours on the same day -- which he agreed to and accepted -- constituted disparate and unfavorable treatment when compared to other officers who either had no disciplinary history, or a minimal history such as Doscher. Plaintiff has failed to show that he was similarly situated "in all material respects" to any of the alleged comparators regarding overtime violations.

### (2) Disparate Treatment Regarding Plaintiff's Discipline And Termination After The IAB Investigation

Plaintiff's argument concerning the purported evidence of "similarly situated" comparators who committed more egregious violations of MTA's rules than lying during an IAB investigation, but were not terminated from employment, fares no better. With respect to this comparison, three different factors come into play: a.) the seriousness of the misconduct engaged in by Plaintiff and the comparator officers, and the level of discipline imposed for such incidents; b.) the effect such misconduct would have on the officers' ability to fulfill their essential police duties in the future, and c.) the prior disciplinary histories of the comparator officers. Although Plaintiff makes a more diligent effort here to show that at least some of the Caucasian comparators committed offenses of similar seriousness, and that one or two

41

comparators had some disciplinary history, his evidence again is mostly second-hand office gossip and he identifies no single comparator that shares commonality with himself on all the three factors listed above, so as to be considered "similarly situated in all material respects." See Ruiz v. County of Rockland, 609 F.3d at 499 (in an action where plaintiff was terminated for the failure to report a co-employee's sexual misconduct with a mental health patient, no inference of discrimination was raised where plaintiff's comparator employees were not similarly situated with plaintiff, who had unique, personal knowledge of the improper relationship and also was accused himself of improper relationships with co-employees); see also Bentley-Ammonds v. Northwell Health, Inc., 2022 U.S. App. LEXIS 7999 at * 6. (Black Plaintiff supervisor and non-Black nurse ,who both improperly shared details about the impending discipline of a subordinate with other employees were not similarly situated because plaintiff was a supervisor and only the non-Black nurse attempted to remediate the inadvertent disclosure).

First, it hardly can be debated that Plaintiff's offense of lying to IAB investigators was a serious offense that could reasonably result in termination. Plaintiff was found to have to have been untruthful with the IAB Officers who were investigating the circumstances surrounding the missing memobook of Sgt. Sokira. (J.A.549-550). When Plaintiff was asked by Sgt. Sokira, a superior officer, if he had seen his memo book, Plaintiff denied that he had seen it and never mentioned that he had found an "unidentified" memobook a few days earlier and locked it in a gun

locker. (J.A. 624-628). Even more troubling, when Plaintiff was interviewed by IAB Officers and asked if he had observed and placed Sgt. Sokira's memobook in a gun locker some days before, Plaintiff responded that he did not recall seeing or placing Sokira's memobook in a locker, even though the IAB investigators had a video showing that he had placed at least "a" memobook in the gun locker. (J.A.626-628).

Finally, when asked a clarifying follow-up question as to whether he had any recollection of picking up "a memobook" from the top of a locker, and then locking it in the locker, he responded ""[n]o, sir." (J.A.375-379). At this point, Plaintiff's deceit became manifest. Although Plaintiff argues that he did not know the memobook belonged to Sgt. Sokira, and his intent was not to get a fellow officer in trouble for losing their memobook, the arbitrator unsurprisingly found that Plaintiff's answers were untruthful and misleading, and provided just cause for his termination when his prior disciplinary record was considered. (J.A.546-552; 560-561). The arbitrator stated: "By lying to Internal affairs, Henvill demonstrated he can no longer be relied upon to provide accurate or truthful evidence on matters being investigated." (J.A. 478; 528-529).

Thus, the offense committed – lying to IAB Officers during an investigation – constituted serious misconduct that would ordinarily warrant severe discipline such as termination. Second, as the arbitrator recognized, dishonesty to superior officers is the type of offense that obviously constitutes a breach of trust that compromises an officer's ability to perform his or her law enforcement duties, including investigation

43

of crimes and communicating with the public and his or her fellow officers. And third, Henvill had a lengthy disciplinary history that was significantly longer and unabated as compared to any of the comparators identified. (J.A.528-529).

Significantly, none of the comparators identified by Plaintiff shared this combination of negative and enduring qualities that would render them similarly situated to him. While Officer Doscher allegedly misused his MTA vehicle on two occasions, and Officers LeBlanc and Chadderton were charged with DWI, each of them were disciplined for these infractions (although not terminated), and no evidence was submitted by Plaintiff that these officers had a long history of prior disciplinary infractions, as Henvill did. In short, Plaintiff has failed to establish that he was "similarly situated" with these Caucasian Officers "in all material respects." Ruiz, 609 F.3d at 493-495.

> **E.** **Even if Plaintiff Made A Prima Facie Showing of Discrimination, MTA Met Its Burden Of Showing A Legitimate, Non-Discriminatory Reason For Plaintiff's Discipline And Termination**

Assuming, arguendo, that Henvill made a prima facie showing of racial discrimination based on a demonstration of disparate treatment, "[t]he burden then shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment." Vega v. Hempstead Union Free Schjoiol Dist., 801 F.3d 72, 83 (2d Cir. 2015), quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). MTA plainly met that burden in this case.

With respect to the November 9, 2011 Command Discipline for accepting two conflicting overtime assignments, the Command Discipline stated that Henvill "willing[ly] accepted two (2) tours of overtime" for the same day in different commands.  (J.A. 434).  It further stated that his actions "caused District 9 to run one officer below normal staffing and also deprived another officer below him in seniority the ability to work a tour of overtime … which led to a reduction of efficiency of the department."  (J.A.434).  The Disciplinary Action imposed was: an 18-hour suspension from duty; another 18 hours held in abeyance for one year, with possible forfeiture if any similar transgressions in the next year; and forfeiture of all overtime polling for his next set of Relief Days following the suspension period." (J.A.434).  Plaintiff signed this Command Discipline, accepting both the findings and proposed Disciplinary Action.  (J.A. 434).  As Henvill signed and agreed to this finding, it clearly constituted a legitimate, nondiscriminatory reason for the discipline imposed.

With respect to the June 17, 2013 Notice of Intent to Discipline and subsequent April 29, 2015 termination, MTA also met its second-step burden to show a legitimate, nondiscriminatory reason for its actions.  The arbitrator's factual findings that Henvill was untruthful to Sgt. Sokira and the IAB Investigators regarding his role in taking possession of Sokira's memobook and locking it in the gun locker, constituted a clear nondiscriminatory reason for terminating his employment, especially considering his lengthy prior disciplinary history.

In fact, MTA was not even required to make such a showing on this appeal because the arbitrator's finding that "just cause" existed for Plaintiff's termination was entitled to collateral estoppel effect.    In the arbitration proceeding, the arbitrator considered whether the plaintiff engaged in misconduct by lying during an IAB investigation, and what if any disciplinary sanction would be appropriate.  Because these exact issues were necessarily litigated and decided in the prior arbitration, they are entitled to collateral estoppel effect in this action.  Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001) ("[a]lthough it may have no preclusive effect in a Title VII suit, a prior administrative finding may supply a non-discriminatory reason for an employment discharge under the … burden shifting framework, after [plaintiff has established a prima facie case").   Based on MTA's second-step showing, the burden necessarily shifted back to Plaintiff to make a showing that MTA's reasons were a pretext for race discrimination.

### F.    Plaintiff Failed To Make Any Showing Of Pretext

Plaintiff relies on the same "disparate treatment" evidence he cited in support of his prima facie showing in attempting to further show that MTA's legitimate, nondiscriminatory reasons for disciplining and terminating him were pretextual, which is permissible.  See Graham v. Long Island R.R., 230 F.3d 34, 43 (2d Cir. 2000) ("A showing that similarly situated employees belonging to a different racial group received more favorable treatment can also serve as evidence that the

employer's proffered legitimate, non-discriminatory reasons for the adverse job action was a pretext for racial discrimination").

However, for the same reasons Plaintiff's disparate treatment evidence was insufficient to raise an inference of discrimination on the prima facie inquiry, which threshold is "minimal," it manifestly is insufficient here to raise a triable issue of pretext. Plaintiff has premised his claims of racial discrimination entirely on his comparison with Caucasian employees, yet he has produced only conclusory and hearsay factual allegations concerning: (1) the Caucasian Officers' alleged misconduct allegedly similar to his own; (2) the amount of discipline they received for those offenses, if any; and (3) the prior disciplinary histories of the Caucasian Officer "comparators" at the time they committed the allegedly similar offenses. (J.A.345-349).

Because Plaintiff failed to demonstrate that his comparators were "similarly situated in all material respects," such ill-fitting comparisons failed to establish a prima facie case of discrimination or that the MTA's reason were pretextual. See Jiminez v. Delta Airlines, Inc., 2023 U.S. App. LEXIS 8726 at *5-*8 ("even assuming [plaintiff] established prima facie cases of both disparate treatment and retaliation, we agree with the District Court that [plaintiff] failed to adduce 'sufficient evidence to support a rational finding that the legitimate … reasons proffered by [defendant] were false"); Harge v. City of New York, 2022 U.S. App. LEXIS 33637 at *4-*5 (even assuming plaintiff made out a prima facie case of race discrimination,

she failed to rebut the defendant's legitimate, non-discriminatory reasons for disciplining plaintiff, who admitted to much of the conduct underlying the "Command Discipline" she received).

## G.  Plaintiff's NYCHRL Claims Were Properly Dismissed

In 2005, the NYCHRL was amended to require a more liberal standard for reviewing discrimination and retaliation claims.  According to the amendments, "courts must analyze NYCHRL claims separately and independently from any federal and state law claims, construing [its] provisions broadly in favor of discrimination plaintiffs to the extent possible."  Ya-Chen Chen v. City Univ. of N.Y., 805 F.3d 59, 75 (2d Cir. 2015).  Unlike its federal and state analogs, the NYCHRL does not require "materially adverse employment actions … rather, an employee must simply be treated 'less well' due to a protected characteristic, such as race."  Harge v. City of New York, 2022 U.S. App. LEXIS 33637 at *7-*, quoting Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 114 (2d Cir. 2013).

With respect to Plaintiff's claims of race-discrimination based on overtime violations and the IAB investigation, he has failed to produce evidence showing that he was treated "less well" because of his race.[5]  The record shows that he agreed to

---

[5] Although Plaintiff's Brief criticizes the district court for neglecting to separately analyze his NYCHRL discrimination and retaliation claims (Plt.-App. Brief, at 35, 43), it makes no substantive arguments as to why the dismissal of the NYCHRL claims was error, and therefore, he has waived such arguments on appeal.  See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently

and accepted his Revised Command discipline for the overtime violation, and he was terminated for the serious misconduct of lying to IAB investigators. Further, Plaintiffs "disparate treatment" theory failed because his comparators were not similarly situated. Thus, he failed to establish that he was treated "less well" than White Officers who committed similar offenses. See Marseille v. Mount Sinai Hosp., 2022 U.S. App. Lexis 29798, at *2-3 (2d Cir. 2022) (discrimination claims dismissed where plaintiff failed to show she was treated "less well" because of her race.)

## II. PLAINTIFF'S RETALIATION CLAIMS WERE PROPERLY DISMISSED BECAUSE HE FAILED TO DEMONSTRATE A CAUSAL CONNECTION BETWEEN HIS PROTECTED ACTIVITY AND MTA'S DISCIPLINE OR TERMINATION, OR THAT MTA'S REASONS FOR SUCH DISCIPLINE AND TERMINATION WERE PRETEXTUAL

### A. Plaintiff's Retaliation Arguments On Appeal

Plaintiff alleges in this action that MTA retaliated against him in two separate instances after he filed a discrimination and retaliation complaints with the EEOC -- first, by removing his summons-issuing authority on March 12, 2012, and second, by disciplining and terminating him between 2013 and 2015 for his misconduct in lying during an IAB investigation. (J.A.556, 559-563).

On appeal, Plaintiff argues that the District Court erred in dismissing his retaliation claims because: a.) a causal connection was sufficiently established

---

argued in the briefs are considered waived and normally will not be addressed on appeal"); see also Adams v. City of New York, 756 Fed. Appx. 85, 87 (2d Cir. 2019).

between Plaintiff's protected complaints and his discipline and termination by the temporal proximity of these occurrences, and also Lt. Dittrich's alleged comment to him that he "was a target"; b.) the evidence did not support the District Court's finding that Capt. Kieran lacked knowledge of Plaintiff's EEOC complaints (filed in January 2012) at the time he directed Sgt. Yasso to remove Plaintiff's authority to write summonses in March 2012; and c.) Capt. Kieran's alleged lack of knowledge of his protected activity was irrelevant because "general corporate knowledge" is sufficient to establish the "knowledge" prong of a prima facie retaliation claim. (Plaintiff-Appellant's Brief, at 43).

Plaintiff's arguments, misperceive the elements of a retaliation claim and ignore Plaintiff's substantial progressive disciplinary history that occurred before any protected activity, which negates the temporal proximity cited.

**B.  Plaintiff Failed To Make A Prima Facie Showing That Plaintiff's Discipline And Termination Were Retaliation For His Protected Activity, Nor A Pretext For Discrimination**

"Federal and state law retaliation claims are reviewed under the burden-shifting approach of McDonnell Douglas, 411 U.S. at 802-04. See Hicks v. Baines, 593 F.3d 159, 164 (2d Cir. 2010); Dawson [v. Bumble, 398 F.3d 211,] 216-17 [2d Cir. 2005]; Reed [v. A.W. Lawrence & Co.], 95 F.3d [1170,] 1177 [2d Cir. 1996]." Kwan v. Andalex Grp., LLC, 737 F.3d 834, 843 (2d Cir. 2013). "Under the first step of the McDonnell Douglas framework, the plaintiff must establish a prima facie case of

retaliation by showing 1) 'participation in a protected activity'; 2) the defendant's knowledge of the protected activity; 3) 'an adverse employment action'; and 4) 'a causal connection between the protected activity and the adverse employment action.' Jute v. Hamilton Sundstrand Corp., 420 F.3d 166, 173 (2d Cir. 2005) (citation and internal quotation marks omitted).  The plaintiff's burden of proof as to this first step "has been characterized as 'minimal' and 'de minimis.'" Id. (citations omitted)." Kwan v. Andalex Grp., LLC, 737 F.3d at 844.

Under the McDonnell Douglas framework, "[o]nce the plaintiff has established a prima facie showing of retaliation, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the employment action.  United States v. Brennan, 650 F.3d 65, 93 (2d Cir. 2011)." Kwan v. Andalex Grp., LLC, 737 F.3d at 845.  Then, "after the defendant has articulated a non-retaliatory reason for the employment action, the presumption of retaliation arising from the establishment of the prima facie case drops from the picture.  See Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000)." Kwan v. Andalex Grp., LLC, 737 F.3d at 845.  "The plaintiff must then come forward with evidence that the defendant's proffered, non-retaliatory reason is a mere pretext for retaliation.  Id.

As in many retaliation cases, the key element of a plaintiff's prima facie showing is the fourth element requiring the plaintiff to establish a "causal connection" between the protected activity and the adverse employment action." Jute v. Hamilton Sundstrand Corp., 420 F.3d at 173.  In 2013, the Supreme Court held in

University of Texas Sw. Med. Ctr. v. Nassar (133 S.Ct. 2517, 2533 [2013]) that

"Title VII retaliation claims must be proved according to traditional principles of but-

for causation," which "requires proof that the unlawful retaliation would not have

occurred in the absence of the alleged wrongful action or actions of the employer."

"However, 'but-for causation does not require proof that retaliation was the only

cause of the employer's action, but only that the adverse action would not have

occurred in the absence of the retaliatory motive." Kwan v. Andalex Grp., LLC, 737

F.3d at 846.[6]

　　　Plaintiff bases his retaliation claim almost entirely on the temporal proximity

between his complaints to the EEOC, on the one hand, and his discipline (removal of

summons-issuing authority) and termination (for lying during an IAB investigation),

on the other. Although "the but-for causation standard does not alter the plaintiff's

ability to demonstrate causation at the prima facie stage on summary judgment or at

trial indirectly through temporal proximity" (id. at 845), the Second Circuit has not

drawn a bright line delineating the outer limits of when an adverse employment

action is too attenuated from a protected activity to constitute a prima facie showing

of retaliatory motive. See Kwan v. Andalex Grp., LLC, 737 F.3d at 845. While this

Circuit has held in the past that a period of a few weeks or months may, with other

─────────────

[6] Plaintiff erroneously cites an outdated "substantial reason" standard for the "causal
connection" prong of the prima facie standard for retaliation. See Kwan, 737 F.3d at
846, n.5.

evidence, create a jury question on the causal connection element, see Kwan, 737

F.3d at 845 (three-week period); Gorzynski v. JetBlue Airways Corp., 596 F.3d 93,

101 (2d Cir. 2010) ("five months"), a period of a year or more would most likely fall

outside the temporal parameters of raising an inference of a causal connection.  See

Natofsky v. City of New York, 921 F.3d 337, 353 (2d Cir. 2019) (finding negative

performance review one year after complaint was made to be too attenuated to infer

causal connection")  Ray v. A.Y. State Ins. Fund, 2018 U.S. Dist. LEXIS 12078

(SDNY) ("the temporal gap of more than a year cannot raise a plausible inference of

retaliatory motive").

　　　　However, in both circumstances, the law is well-established that temporal

proximity alone is insufficient to establish the causal connection element.  See Kwan,

737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary

judgment at the pretext stage"), citing El Sayed v. Hilton Hotels Corp., 627 F.3d 931,

933 (2d Cir. 2010); see also Bentley-Ammonds v. Northwell Health, Inc., 2022 U.S.

App. LEXIS 7999 at *11 (holding that while temporal proximity is relevant to prove

a retaliation claim, it is insufficient on its own to meet plaintiff's burden to show

pretext).  In most cases, such temporal proximity must be combined with an

additional showing of "weaknesses, implausibilities, inconsistencies, or

contradictions in the employer's proffered legitimate, non-retaliatory reasons for its

action.  Kwan, 737 F.3d at 846.  Here, Plaintiff fails to cite any weaknesses,

inconsistencies or implausibilities in the circumstances of the removal of Plaintiff's

summons-issuing authority and his termination for lying during an IAB investigation that might raise a question of fact as to pretext.

Moreover, even in circumstances of relatively short time duration between the protected activity and the alleged retaliatory adverse employment action, it is well-settled that "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began *well before* the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise (emphasis added)." Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 95 (2d Cir. 2001); see Offor v. Mercy Med. Ctr., 2023 U.S. App. LEXIS 6687 at *5 (no inference of retaliation was available where plaintiff overlooked the extensive investigatory and disciplinary actions relating both to her behavior and her performance that defendants undertook before she retained her attorney).

Here, Plaintiff has failed to provide any evidence of a causal connection beyond temporal proximity, and in fact, he confuses the second "knowledge" element of a prima facie showing of retaliation with the fourth "causal connection" element.[7] Plaintiff argues that Capt. Kieran's sworn Declaration, stating that he was unaware of Henvill's EEOC complaints at the time he directed that Plaintiff's summons-authority be removed, was insufficient to show that defendant lacked knowledge of the

---

[7] Plaintiff erroneously argues that the district court dismissed the retaliation claim because it held the "knowledge" prong was not established. (Plt.-App. Brief, at 47). This is incorrect, as the court held that the prima facie showing "failed at the causation prong." (S.A.11).

protected activity (the second prong of the prima facie showing) -- because the "general corporate knowledge" of MTA is sufficient to fulfill such knowledge prong. See Kwan v. Andalex Grp., LLC, 737 F.3d at 844 ("for purposes of a prima facie case, a plaintiff may rely on 'general corporate knowledge' of her protected activity to establish the knowledge prong of the prima facie case").

While this statement of law is correct as to the "knowledge" prong, it is not an accurate statement with respect to the "causal connection" prong. On the contrary, courts in this Circuit, including the Kwan court cited by Plaintiff, have held that "general corporate knowledge" alone is insufficient to satisfy the "causal connection" prong of a plaintiff's prima facie showing of retaliation. See Ehrbar v. Forest Hills Hosp., 131 F.Supp.3d 5 (EDNY 2015) (a plaintiff cannot rely on general corporate knowledge alone to satisfy the third 'causal connection' prong"); Kwan v. Andalex Grp., LLC, 737 F.3d at 844, n.4; Weber v. City of New York, 973 F.Supp.2d 227, 268 n.25 (EDNY 2013). Thus, Kieran's uncontradicted denial of knowledge of the EEOC complaints was strong evidence demonstrating the lack of any causal connection between Plaintiff's complaints and the removal of his summons authority and termination.

In any event, the two-month period between Plaintiff's January 2012 initial EEOC complaint and the March 2012 removal of his summons-issuing authority is not controlling in this case, where it is undisputed that Plaintiff had a lengthy and consistent history of summons-writing violations that occurred prior to his protected

55

activities.  See Offor v. Mercy Med. Ctr., 2023 U.S. App. LEXIS 6687 at *5; Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d at 95.

And, as to the temporal proximity between the EEOC complaints and Plaintiff's termination, it is clear that this period exceeded one-year and on its face creates no inference of retaliatory motive.  See Ray v. A.Y. State Ins. Fund, 2018 U.S. Dist. LEXIS 120728 (SDNY) ('the temporal gap of more than a year cannot raise a plausible inference of retaliatory motive").  While Plaintiff makes the argument that this period in excess of one year should not be considered because the investigation and arbitration were "continuing," and his disciplinary history "escalated after this protected activity", the fact remains that MTA knew of his EEOC complaints approximately three years before he was terminated, substantially negating any inference of retaliation.

Besides failing to establish a prima facie case of retaliation for either the removal of Plaintiff's summons-authority or his discipline and termination resulting from his dishonesty, Plaintiff also failed to produce sufficient facts and circumstances demonstrating that these disciplinary measures imposed were a pretext for MTA's retaliatory motive.  With respect to the removal of his summons-writing authority, his long history of summons-related infractions and discipline, combined with the fact

that most of it occurred prior to his protected activity, substantially undermines any inference of pretext.[8]

Similarly, with respect to his discipline and termination arising out of the IAB investigation regarding the missing memobook, the video of the incident demonstrates that his own actions triggered this investigation without any role by MTA.  Further, Plaintiff's deposition testimony concerning his untruthful statements during the IAB interviews makes it clear that, when given a chance to set the record straight concerning his deception during the interview, Plaintiff continued to provide false and misleading answers.  No reasonable trier of fact could find that Plaintiff's protected activities were the true reason for his termination, and that "but for" MTA's motive to retaliate for the EEOC Charges, he would not have been disciplined or terminated.

### C. The Retaliation Claim Under NYCHRL Was Properly Dismissed

"In order to succeed on a NYCHRL retaliation claim, a plaintiff 'must show that []he took an action opposing h[is] employer's discrimination and that, as a result, the employer engaged in conduct that was reasonably likely to deter a person from engaging in such action.'  Mihalik, 715 F.3d at 112."  Alvarado v. Nordstrom, Inc.,

---

[8] Plaintiff's reference to certain "contested facts" regarding whether his acceptance of two tours of overtime was "intentional," and his further reference to Lt. Dittrich's alleged comment that plaintiff had a "target on his back," as evidence of retaliation should be disregarded, because the facts underlying these incidents (relating to overtime) were never alleged to be a basis for the retaliation claim.

57

685 Fed. Appx. 4, 2017 U.S. App. LEXIS 5426 at *8. "Under this standard, 'summary judgment is [only] appropriate if the record establishes as a matter of law that … retaliation played *no* role in the defendant's actions. <u>Ya-Chen Chen v. City Univ. of N.Y.</u>, 805 F.3d at 76.

While this standard is low, this is one of the rare types of cases where no questions of fact are raised. Plaintiff's long history of summons-related offenses and his serious misconduct in lying to IAB investigators compels the conclusion that Plaintiff's 2012 EEOC Charges played no role in his discipline and termination. Nor was there any reasonable inference that MTA's conduct was likely to deter discrimination or retaliation complaints, since it was MTA's duty and responsibility to issue discipline for overtime violations or terminate officers who are dishonest during an investigation.

In any event, Plaintiff has abandoned this argument on appeal by failing to make any substantive arguments for reversing the dismissal of the NYCHRL retaliation claim. <u>See</u> <u>Norton v. Sam's Club</u>, 145 F.3d at 117.

58

## CONCLUSION

In light of the foregoing, it respectfully is requested that this Court affirm the

Order and Judgment below dismissing the Plaintiff's Second Amended Complaint.

Dated:    White Plains, New York
          May 3, 2023

                        Respectfully submitted,


                         /s/William T. O'Connell
                        William T. O'Connell, Esq.

                        **GOLDBERG SEGALLA, LLP**
                        ***Attorneys for Defendant-Appellee***
                        ***MTA***

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
## LIMITATION, TYPEFACE REQUIREMENTS
## AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Fed.R.App.P.32(a)(7)(B) because:

    This brief contains 13,478 words, excluding the parts of the brief exempted by Fed.R.App.32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed.R.App.P.32(a)(5) and the type style requirements of Fed.R.App.P32(a)(6) because:

    This brief has been prepared in Proportionally-Space typeface using

    Microsoft Word, in Times New Roman, Font Size 14.

Dated: May 3, 2023

   /s/William T. O'Connell
William T.O'Connell, Esq.
GOLDBERG SEGALLA, LLP
Attorneys for Defendant-Appellee
MTA